[No. 24723.   Department One.   November 24, 1933.]

SCHOENFELDS' STANDARD FURNITURE COMPANY, *Appellant*, v. PAUL STOE *et al., Defendants,* O. H. WILSON *et al., Respondents.*[1]

[1]Reported in 27 P. (2d) 564.

*Byers & Byers, Frank D. James, Jr.,* and *Monheimer & Griffin,* for appellant.

*Carkeek, McDonald & Harris,* for respondents.

STEINERT, J.—This is a replevin action wherein plaintiff sues to recover certain household furniture sold under conditional sales contract, or, in the alternative, for its value. The cause was tried before the court without a jury. The court granted plaintiff judgment against defendants Stoe for the amount found to be due and owing on the contract, but held that plaintiff was estopped, by its acts, from asserting title to the property as against defendants Wilson. In the judgment, it was decreed that the title of the Wilsons to the property was superior to that of plaintiff, and that the Wilsons should recover from plaintiff their costs and disbursements to be taxed. The plaintiff has appealed from the judgment in so far as it is unfavorable to it.

The facts present an unusual situation. It appears that, on October 19, 1929, Paul Stoe, Inc., a corporation, entered into a real estate contract with Leslie Walderon and Helen B. Walderon, his wife, wherein the former agreed to sell, and the latter agreed to purchase, certain real estate in the city of Seattle, for a price of $5,600, of which $500 was then paid in cash, $2,500 was to be paid by the assumption of an existing mortgage, and the balance was to be paid in monthly installments. Upon the lot was a newly-constructed, but as yet unfurnished, house, whose street number was 8254 Interlake avenue. Included in the contract was certain personal property, consisting of an electric range, electric water heater and inlaid linoleum.

The contract was filed for record as a real estate contract and also as a conditional sales contract.

Mrs. Walderon was at the time engaged, in a small way, in buying residence properties, equipping them with furniture and selling them as furnished houses. The appellant knew that Mrs. Walderon was engaged in that business.

As a part of the transaction under which the above real estate contract was executed, Paul Stoe, individually, and the Walderons also had an agreement under which Stoe was to purchase from appellant certain household furniture to be installed in the new house. The arrangement between Stoe and Mrs. Walderon was that Mrs. Walderon was to select the furniture and Stoe was to sign the conditional sales contract therefor, as vendee, and to make the payments thereon. In some way not fully disclosed by the record, Mrs. Walderon was ultimately to repay Stoe, or possibly Paul Stoe, Inc., for the furniture.

Acting under this arrangement, Mrs. Walderon went to appellant's store on or about October 19, 1929, and, with the assistance of one of appellant's salesmen, selected the furniture involved in this action. Mrs. Walderon explained to the salesman that the furniture was to be installed in a house which she intended to sell as a furnished house, the same as she had done on former occasions when furniture had been purchased by her, under conditional sales contracts, from the same salesman. She further explained to the salesman the arrangement that she had with Stoe. After the furniture had been selected, Stoe signed the contract, which bore date October 22, 1929; Mrs. Walderon was in no way named or mentioned therein. The contract gave Stoe's address as 600 East 77th street, Seattle, which was his place of residence.

The furniture sold was covered by seven order slips,

whose dates ranged between October 16th and November 1st, 1929. The furniture was evidently delivered in successive lots. In five of the slips, Stoe's address was noted as being 600 East 77th street; in one it was given as 8450 Interlake; and in another as 8250 Interlake. In some of the slips, it appeared that Mrs. Walderon had given the particular order; in others, that Mr. Stoe had given it; and in still others, that both Stoe and Mrs. Walderon had given it. Three of the five slips giving Stoe's address as 600 East 77th street indicate the place of delivery of the furniture as 8450 Interlake; the other two do not indicate the place of delivery.

In the conditional sales contract itself, which was duly filed for record, no mention was made of the Interlake address, but only of the address of Stoe at 600 East 77th street. The furniture was actually delivered, however, to Mrs. Walderon at *8254* Interlake avenue, where the house which she had purchased from Paul Stoe, Inc., was situated.

After the house had been furnished, Mrs. Walderon listed it for sale as a furnished house. Respondents contacted the real estate agent that had the property in charge, and through him entered into a real estate contract with the Walderons on January 11, 1930. By the terms of that contract, the respondents agreed to buy the real estate and the furniture here involved for the sum of $5,950. Attached to the contract was a complete inventory of the furniture. Of the purchase price, $350 was paid in cash, $2,500 by the assumption of the outstanding mortgage, and the balance of $3,100 was payable in installments of sixty dollars or more per month. It was further provided in the real estate contract that it should be considered as a conditional sales contract as to the personal property until the respondents had paid one thousand five hundred dol-

lars, whereupon the title thereto was to vest in them as vendees.

Shortly after the respondents had gone into possession of the property, the Walderons either assigned, or else quitclaimed, their interest in the Wilson contract to Stoe, or to Paul Stoe, Inc. This transfer was made as a down payment on a second house that was being purchased by the Walderons from Paul Stoe, Inc. Mrs. Walderon then advised appellant that she had sold the first house, and that she was then ready to select other furniture for the second house, under the same arrangement as before; that Stoe was to sign the conditional sales contract covering the furniture; and that she would then endeavor to sell the second house as a furnished house. The second arrangement regarding the furniture was carried out upon the same general terms as the first.

Within sixty days after the execution of the Walderon-Wilson contract, the respondents paid to Paul Stoe, Inc., about $473, bringing the balance of their contract down to five thousand dollars, which amount represented the outstanding mortgage and the interest of a finance company to whom Paul Stoe, Inc., had conveyed the property. Thereafter, the Wilsons made their monthly payments to the finance company, and Stoe continued to make the payments on the furniture to appellant until June 2, 1931, when he defaulted. In May, 1932, more than two years after respondents had purchased the furnished house from the Walderons, and while they were paying their installments to the finance company, the appellant demanded of respondents that they pay the delinquent furniture installments. This was the first information that respondents had that the furniture was not paid for, or that there was any conditional sales contract affecting it.

They declined to make the payments demanded by appellant, and this action was commenced.

Appellant contends that the case falls squarely within the doctrine of *caveat emptor*. Section 23 (1) of the uniform sales act is relied on. That section reads as follows:

"Subject to the provisions of this act, where goods are sold by a person who is not the owner thereof, and who does not sell them under the authority or with the consent of the owner, the buyer acquires no better title to the goods than the seller had, unless the owner of the goods is by his conduct precluded from denying the seller's authority to sell." Rem. Rev. Stat., § 5836-23.

We think that the facts of this case, as established by the evidence and as found by the court, bring it within the exceptions provided in that section. We think that the appellant either impliedly consented to the sale of the furniture by the Walderons, or else is by its conduct precluded from denying the authority of either Stoe or the Walderons to sell it. Knowing that Mrs. Walderon was engaged in the business of selling furnished houses, and having on former occasions supplied her with furniture which it knew was being disposed of by her in the sale of such houses, and knowing specifically that she intended to do this very thing on this occasion, the appellant nevertheless delivered the furniture to Mrs. Walderon, and must therefore be held to have impliedly consented to or authorized the sale to respondents.

The nearest case to this, in point of fact, that we have been able to find, from independent investigation, is that of *Spooner v. Cummings,* 151 Mass. 313, 23 N. E. 839. In that case, the plaintiff had sold four horses to a livery-stable keeper under a conditional sales contract which reserved absolute title in the vendor until the horses were paid for. The defendant purchased

one of the horses from the livery-stable keeper. The plaintiff, not having been paid therefor, sought to replevy the horse. The court held that it was competent to show the course of dealing between the plaintiff and the livery-stable keeper which indicated that the horse was being purchased for resale. The court further held that, the course of dealing having been established, the jury was rightly permitted to find that the plaintiff had impliedly authorized the resale. So, in this case, appellant's course of dealing with Stoe, and particularly with the Walderons, was such that the court had the right to find, as it did, that appellant thereby impliedly authorized the sale of the furniture to respondents.

Appellant further contends that the respondents did not rely upon any act or omission on the part of appellant, but that, having made an independent, yet incomplete, search of the records and having failed to ascertain the true state of the title, it was their negligence that occasioned the loss. It may be conceded that respondents did not go to the extent of examination and inquiry that prudent persons would ordinarily be called upon to exercise. But that, we think, is beside the point here. If, as the court held, the appellant conferred authority for the sale of the furniture to respondents, it would be immaterial what the records showed. The mere fact that the title or interest of one in possession of personal property is evidenced by a conditional sales contract of record would not affect the right of such person to sell the property if, as a matter of fact, he has actual or implied authority to sell it; the authority to sell such property implies the expectation that it will be sold, and also implies the authority to pass title to it if it is sold.

We are fully aware that, in the operation and application of the conditional sales act, many situations

may arise wherein a subsequent purchaser, though entirely innocent, would not be protected against the constructive notice afforded by the recording of such contract. We do not intend to lay down herein a principle that will govern all cases of dispute concerning the prior rights to property sold under conditional sales contract. We are here dealing with a particular and peculiar state of facts, and the rule that we announce applies only to such cases as fall within the same general class. The law bearing upon conditional sales is broad, and its application is variant according to the peculiar state of facts at hand. Experience and discretion should lead business men who employ that method of transacting business to bring themselves within the protection of the law that has been fashioned for their benefit, and to see to it that, by their conduct, they do not help to bring about a situation where other persons, as innocent as they, may be defrauded.

The judgment is affirmed.

BEALS, C. J., MILLARD, MAIN, and MITCHELL, JJ., concur.